This morning, if I can get my chair to the desk, Judge Dabena and I are delighted to welcome Judge Leslie Abrams, the Middle District of Georgia, from Albany, or as people from there say, Albany. She's a graduate of Yale Law School, but it's been a decade and a half. She's worked hard and has largely overcome that. She spent some time with two blue-chip law firms, Skadden Arps and Kilpatrick Stockton, and also was Assistant United States Attorney in the Northern District of Georgia for four years. She's been on the bench for three years now, and we are absolutely delighted to have her. She has every bit as much authority and responsibility for deciding these cases as Judge Dabena and I do, and I assure you she will receive her share of the work resulting from it. All right, first case up, Langford v. Hale County Commission, Mr. Kidd. Oh, I'm sorry, Miss. Sometimes they sit there, sometimes they sit the other way. I should have known from the IE, but Miss Kidd, welcome. Thank you. May I please be in court? My name is Jamie Kidd, and I, along with my partner Randy McNeil, represent the Hale County Commission and Judge Arthur Crawford in his official capacity as Hale County probate judge. The district court in this case erred in two ways. First, it erred when it granted summary judgment for Ann Langford as to her procedural due process claim by finding as a matter of law that she had a property interest in her position as chief clerk. It then compounded that error. Was she a permanent employee? Your Honor, that is, I think, one of the major questions. Was she a permanent employee? Your Honor, we say no. Well, she completed the three-month probationary period, had she not? Yes, Your Honor. And the handbook looks crystal clear to me that after the three-month probationary period, you're a permanent employee. Tell me why that's wrong. Well, Your Honor, I think the handbook, first of all, it does use the term permanent employee, of course. It also does, we admit, make references to due process. On the other hand, it also leaves discretion for, you know, why people are fired, setting standards, how they're fired to the supervisors, to management supervisory personnel. But even if the handbook could make an employee, a Hale County employee, a normal employee who was hired under its procedures, a permanent employee with property interest in her job, the key fact here is that Ms. Langford, as chief clerk of the probate court, was not hired like any other employee. She didn't apply. The commission didn't vote on her. The former probate judge went to her one day and said, hey, you want to come be my chief clerk? And that was pretty much that. So your argument is she's really an at-will employee, is that right? Yes, Your Honor. And I know that the district court- Okay, tell us what evidence would support that she is an at-will employee rather than a permanent employee. The first, you know, going back to the way that she was hired. First of all, the idea that she was not hired through any sort of formal procedures in the handbook. She was personally chosen by Judge Avery due to their pre-existing relationship. What permanent employees in the, I mean, what procedures in the handbook govern the hiring of non-at-will employees? The, there are procedures in the handbook that provide for such employees to, you know, for positions to be advertised, for employees to apply. I will admit that the handbook is not a model of clarity, certainly. Is it your client on a regular basis, the Elk County Commission? Not- Whose responsibility is it for this handbook? It's poorly driven from beginning to end. Yes, Your Honor. Absolutely. They actually had a county attorney at the time and then Judge Avery, of course, and Anne Langford as the chief clerk. All you have to do is say all employees are at-will employees under Alabama law and that distorts the property interest. That's it. Yes, Your Honor. Or, more likely, the chief deputy clerk is an at-will employee because of the sensitive nature and confidential relationship she has with the probate judge. That wasn't done. Yes, Your Honor. What's the reference to management slash supervisory personnel? It's never defined anywhere. No, it's not, Your Honor. I also note one of the other, you know, frankly, issues with the handbook is that there's a provision in the disciplinary position that provides that somehow actions can only be It's clearly meant to apply to road employees and their sort of mid-level supervisors, but of course, that's not well-defined either. I mean, that's a large part of the problem here is that the handbook that was inherited by Judge Crawford, because I think it's important to keep in mind at this point in time that, you know, he had only been in . . . when all this came, he had only been in office for a couple of months. It was a holdover from the previous administration. I mean, we're not . . . maybe my question misled you. We're not finding fault. The question is whether or not there was a property interest created under Alabama law. Is there any evidence that the plaintiff was ever told that she was on probation? Your Honor, the . . . no. As a matter of fact, the issue, Ms. Langford testified that the issue of her having due process only came up after Judge Avery lost the election, that she became aware that she had due process rights because Judge Avery told her, you know, years and years in her employment that, well, you know, you have these rights, and then she was informed by her attorney. Now . . . The fact that she didn't know that she had the right . . . assuming she had the right, what is her knowledge of it? How is that important at all? Because property interest goes to reasonable expectation and the employee's, you know, understanding of why they can be fired. I think in this particular case, that is at least a genuine issue of material fact that, yes, it could go . . . it could be nothing. It could just be a reminder, but it could also be evidence, and I think a reasonable jury could find that that was evidence that the whole property interest only came up after . . . Well, at the time that she was terminated, she did know that she had a right to at least have it explained to her and she had a right to appeal it. So, whether or not she recognized it as a property interest or a due process right, she did know that there were procedures that should have applied to her firing, correct? Your Honor, I think that that is one of the issues of disputed fact, frankly. We say that . . . no, we say that her testimony that she primarily found out about all of this after the fact . . . But her actions were, didn't she ask for a letter, didn't she ask for an explanation? I know she didn't ask for a pre-termination hearing, but didn't she seek some level of review of Judge Lankford's . . . I'm sorry, Judge Crawford's determination to fire her? Yes, she did, Your Honor. However, interestingly, the review that she sought actually wasn't the review provided in the handbook. The handbook provides that you go to a personnel appeals board. She went instead first straight to the Commission and asked the Commission to overturn it, which they refused to do and said, look, if you want, you can do that. And so then she went to the personnel appeals board, which I think negates a possible inference that she actually thought that she did have such due process rights because she didn't follow . . . Well, she may not have known the exact procedure, but she knew she had some right, correct? You can see she knew she had some right, even if she thought she could appeal to the Commission,  Yes, Your Honor. She knew that she could ask somebody else to review Judge Crawford's . . . She knew that she could or she simply wanted to? And I think that's . . . she knew . . . when I say she knew she could, I mean, she knew she literally could go ask somebody that there was the Commission, it was a separate body. Whether she knew that she had a right to do so in a more formal setting . . . Is it undisputed that she supervised other clerks in the office? Absolutely. And what did that . . . is there something in the record about what that entails? Yes, Your Honor. The position of chief clerk actually derives from the statute . . . I'm not talking about the statute. What did she actually do? There's testimony both from her, from Judge Crawford, and at the summary judgment stage that she is chief clerk. First of all, she did basically everything the probate judge did. She was the only one who could help him in some of his judicial duties, but she was also in charge of the office. If the probate judge wasn't there, she, unless it was a contested case, acted as the probate judge. She had full . . . I mean, she could, you know, sign, use his stamp, and she was the only one in the office who could do that. All right. But did she supervise the other clerks? Yes, Your Honor. Were they called deputy clerks? They just called them clerks, and she's chief clerk. Okay. Let me ask you a question real quick. You're about to run out of time. About damages? Yes, sir. The one part of this case that really gives me pause is damages. And when I look at our earlier cases, Sykes versus McDowell, we affirmed a $60,000 judgment in a case similar to this. But that's the largest award I can find of any of our prostitutes. And here, she was awarded, I think, $110,000. Yes, sir. Speak to us about that. What was the basis for the . . . well, it was the jury. The jury actually awarded it, so I guess we don't know. But what was her basis for that amount, claiming that amount of damages? The basis now, after the fact, and after the jury instructions and the verdict came back, has been that she presented evidence of emotional distress related primarily to the lack of procedure itself. The thing in this case, though, is that the jury was instructed, and the judge had actually held on the record in the course of the charge conferences. Your Honor, I see my time has expired. That's all right. You can answer. And let me ask you this while you're answering. Did you object to the jury instructions? No, sir, we didn't. Because frankly, we thought that the jury instructions were correct. The jury instructions were that you either have to give her nominal damages or you give her damages based on her termination if you find that the termination would not have occurred if she'd had a procedural due process hearing. The judge specifically held, and there's lengthy discussion about this in the record, that she had not put on sufficient evidence of emotional damages deriving solely from the procedural due process violation. So we did not object because frankly, we thought it was right at the time. It was only after the fact that the emotional damages were used as an excuse to uphold the jury verdict. Let me ask you this. Do you concede that employee as opposed to management is entitled, has a property interest in the job in the sense that they can't be terminated without cause? Yes, Your Honor. I think the way the handbook is written, a general low-level employee of Hale County. So this just boils down to whether or not she was an employee as opposed to a management supervisory staff, right? Yes, Your Honor. Whether she was a confidential employee, which I know- I mean, what does confidential employee have to do with the property interest? In terms of the nature of her position being management supervisory staff and not having a- In other words, simply a correlation. A supervisory staff in management is more likely to be in a confidential position. Yes, Your Honor. And that was actually the basis for Judge, the reason it comes in is because Judge Crawford, the reason, and I note that the district court granted him summary judgment in his individual capacity on qualified immunity grounds because it found that he reasonably believed that because she was a confidential employee as his chief clerk, that she, you know, was not entitled to this interest. You know, there's so much wrong with this policy and I'm not sure this is directly relevant. The most puzzling sentence to me is on Roman numeral 2i, probationary employees shall share in all the benefits of employment of the county except that dismissals for cause during the probationary period shall not be grievable, implying that dismissals without cause are grievable. That's just- Whatever we do in this case, y'all need to get with this client and I don't see how anybody can follow this. Yes, sir. That has already been done. All right, we'll hear now from Mr. Ingram. Good morning. Let me tell you where I'm moving towards and I'm not there yet and I'm just speaking for myself. It seems to me that this plan distinguishes between employees and those who, I guess, are technically employees but they're part of management and part of supervisory staff. You agree with that, I assume? Your Honor, I don't believe the handbook makes the distinction between rank and file employees and- Let me put your attention on Roman numeral 2 part D on page 2. Each employee shall be given a copy of his or her description and employees have a handbook outlining all the policies, conditions, and benefits. Both employee- Sick employees. Both employee and management supervisory staff will be required to know and productively implement all the provisions, etc. Both employees and management supervisory staff. And then in F, it says, when disagreement over solution of problems cannot be resolved, permanent employees shall have access through a grievance procedure to successfully higher levels of management. Management slash supervisory personnel will produce resolution of problems, of grievances, etc. That, to me, seems to draw a distinction between employees, permanent or otherwise, and management supervisory staff. What am I missing on that? Your Honor, I believe that the handbook does distinguish duties between management and rank and file employees. But I don't believe that those provisions make a distinction as to the due process allowed for rank and file employees or management. I believe the only distinction in the handbook is between probationary employees, which are those that have not been employed for three months, and permanent employees who have been employed longer than three months as far as due process and the property interest that's created by the handbook. Yeah, but there's a distinction in the parts I just read to you between employees and management supervisory staff. And then they further distinguish two classes of employees. One are probationary and the other are permanent employees. But it doesn't say permanent management slash supervisory staff, for example. It does not. Ms. Lankford did not participate in writing the handbook. But we believe that based on page two, all employees of Hale County, all permanent employees of Hale County are entitled to due process. We believe that trumps getting into the... But then that begs the question of what for purposes of this handbook is a permanent employee and whether that includes management slash supervisory staff. They could have said non-management slash supervisory staff permanent employees, but that's rather awkward construction. Sure. And as I understand Alabama law, and this is not the law everywhere, but as I understand Alabama law, there's a strong presumption against creating a property interest in a position of employment and vitiating the at-will presumption that Alabama law puts into place. Am I wrong about that? That's correct, Your Honor. But the Hoffman-LaRoche case, they state in there that if the handbook is not intended to form a unilateral contract, it's free to do so. Likewise, the handbook is free to state that it does not apply to the... I understand that, but the question is what happens when there's some ambiguity, when the statement isn't clear in the handbook? And as I understand Alabama law, when that's the case, when there are indications pointing both directions, unlike the contra-preferendum canon, if you had that, you'd win. Sure. But you don't have that. Alabama law says no, it has to be strong and clear. I thought for a while, okay, that makes sense in the private employment contract because the overwhelming presumption there is the employer can discharge the employee at will absent some contractual provision. But there are Alabama cases applying that in the government context as well. So tell me why that presumption isn't a serious... Tell me why you don't have to show that it is clear in here that your client was not management slash staff distinguished from employee. Your Honor, I'm not sure that I can. Again, I wish I'd had some more input into the writing of it. I agree it is ambiguous to say the least. Why don't you lose under the presumption if it is ambiguous is what I'm asking. Your Honor, in the briefs, the Green versus City of Hamilton case was cited to by the appellants as to the problems with the handbook, the fact that it wasn't clear. And in the Green case, it says of most relevance would be those provisions in which the employer again uses the term permanent to describe the status of some employees. And I understand what the court's asking. But we believe that the handbook, albeit not perfectly, does establish the distinction between permanent and probationary. When it gets into the issues with management, it's not as clear. But I believe that the overriding preamble on page two that covers everyone, that any, that all permanent employees, and it doesn't make the distinction between management or rank and file, but that all permanent employees are entitled to due process. Was this job position filled from a register of eligible applicants? Your Honor, it states in the handbook that whenever possible, the job shall be filled by a register of qualified applicants. And in this case, it was filled by a register of one. Judge Crawford . . . Well, I mean, that's the way of saying you can fill it with whoever you want to and disregard any need for a register. Oh, yes, sir. And I dissected that in the trial, speaking specifically about the way Judge Crawford hired Patricia Pickens and Ms. Lankford's replacement. But Judge Crawford testified that he could hire whoever he wanted for the position. David Rogers, one of the county commissioners, stated that he believed Ann Lankford was an employee of Hale County. He believed, she was certainly paid by the county commission. And when I say Hale County, I meant county commission. And again, going back to your question, I dissected that. But I believe the answer, Hale County is a small county. And when you were talking about, I believe, Judge Dabena, I believe you asked about her supervisory role. It's a small county. It's a small office. There's not a hundred clerks working there. How many are there? I believe four. And I believe that includes the chief clerk. So she's one of four. And she supervises the other three. That's correct. And when the probate judge is gone, it's news to me, but apparently she can act in non-contested matters. She can, in fact. That sounds like the core of management supervisory to me. And it doesn't sound like employee in the usual sense. But again, this handbook wasn't followed in parts B and C of Roman numeral II because there was no register of eligible employees. And then in C, in filling vacancies above the entry level, this was definitely above entry level. First consideration will be given to qualified county employees eligible for promotion. And she wasn't a current employee at that time, was she? She was not. And so the qualified employees eligible for promotion would have been those other three clerks. At the time, they would have been. And he testified that, well, the way this applied, I didn't think I was bound by that in hiring my chief deputy clerk or chief clerk. Your Honor, I would also point out that one of the issues you've seen in this case was that Judge Crawford, the reason that Judge Crawford came up with ultimately as to why he terminated Ann Lankford was because Laura Barrett was leaving. She was a subordinate clerk. When Laura Barrett left, Juanita Moore was hired the same way. There was not a register of applicants. And there's no question that Juanita Moore was a rank or Laura Barrett was a rank and she was hired by Judge Crawford the same way Ann Lankford was. I'm not, you understand, I'm not saying somebody did wrong by violating this. I'm saying it wasn't applied in the usual course of hiring decisions. Yes. However, to use that she was hired differently makes her somehow not susceptible to the handbook not being a property interest. She was hired and to the degree that the personnel manual makes a distinction between supervisory employees and rank and file employees. She was hired the same way the subordinate clerks and everyone else is hired in Hale County. Indicates to me that any property interest created here is very weak because this isn't followed. There's not very much of the Hale County personnel policy that seems to be followed. Okay. But doesn't that undermine the property? Property interest is something you have a right to under state law. Correct. And they didn't treat this in external indications account and they didn't externally indicate from their behavior that this was binding on them under Alabama law. I do. Your Honor, we do cite to Harbison v. Strickland, which is an Alabama Supreme Court case, that states it's elementary that it's the terms of the written contract, not the mental operation of one of its parties that control its interpretation. It's an objective test, but as I understand it in property interest, and I'll go back and make sure my understanding is correct, the external manifestations of whether it's followed or not are relevant to whether there's a property interest in that. Now, how you divide that, how you separate that from subjective, I don't know. Let me ask you one other thing. Sure. In filling vacancies above the entry level, first consideration will be given to qualified county employees eligible for promotion. Okay. To the extent that this employee's handbook creates property rights, did that give a property right to the other three clerks to be given first consideration for this position? The argument certainly could be made that it would, but whether they followed it or not, and I do understand the external manifestation argument, I think that's valid. However, why they chose not to follow their own personnel manual, I can't speak to. Well, to the extent that she had a property interest, one of the things you're seeking is reinstatement. That's correct. In order to reinstate her, then you would have to essentially fire Ms. Pickens. Doesn't Ms. Pickens now have a property interest that would be at issue if Ms. Langford were returned to that position? That's correct, but there are other positions in Hale County. For example, David Rogers, one of the commissioners who spoke at the trial, he said that he went to Judge Crawford and asked him if Ann Langford could work at the Humane Society, just something for her to do to round out. But she's not necessarily seeking reinstatement to the chief clerk. She just wants another job. She would certainly prefer to be chief clerk, but she would value reinstatement at any position as long as it was comparable in pay and compensation. And I just wanted to ask on a slightly different. Ms. Langford did not go forward with the state remedy. So she didn't seek a post-termination hearing. And the reason for it was that there were too many biased people against me. How does the fact that she did not, under McKinney, seek that post-termination hearing affect whether or not there was a violation? Okay. Your Honor, McKinney does address that. That pre-termination violations can be cured by post-termination remedies, and that's pointed out by the appellants. However, McKinney also cites to Loudermill, which states that something has to be done. And there was no pre-termination anything to be corrected in this case. She was simply told, you no longer have a job. You violated the trust and the confidence. But she didn't exhaust her state remedies at this point. So we don't know what would have happened had she gone through the post-termination hearing. Correct? That's correct. But my point being under Loudermill, that Hale County had to make some effort. They had to make some effort to try to afford Ms. Langford her due process rights. And by not doing anything, there was nothing post-termination that could have been corrected. You can't correct a nothing. That's sort of the point. Well, but I guess the fact that she, if she's accepting this right and she doesn't pursue the right, then, and she actively waived, it seems, the right to even follow the process. She hadn't been denied a post-termination hearing. So Hale County, if Hale County had said, no, you don't get a post-termination hearing, then they would have, quote unquote, done nothing. But they didn't get the opportunity to say that, correct? That's correct. And again, it would be our argument under Loudermill that in order to seek the correction post-termination, you have to try to do something pre-termination. Let me, let me ask you one last question. There's a companion case out there that's on appeal right now. That's correct. The Galbraith case. And I think the only thing that's been done in that case, I think the appellant's brief was just filed. It was, Your Honor. Are you counsel in that case? I am, Your Honor. Did Judge Grenade basically follow the same analysis that Judge DuBose did on summary judgment in this case? Was there anything about that case that distinguishes it from this case? Yes, Your Honor. Yes and yes. Judge Grenade in the Galbraith versus Hale County case followed Judge DuBose's analysis and stated in her summary judgment order that Judge DuBose's analysis of establishing the property interest through the handbook was so complete, she saw no reason to deviate from it. Now, Judge Grenade did not grant summary judgment in favor of the plaintiffs in that case because the distinction was Ann Lankford was the chief clerk. Trisha Galbraith, it's spelled Trisha but pronounced Trisha, she was the county administrator and she had a written contract. And Judge Grenade believed there was a genuine issue of material fact as to what controlled the written contract or the personnel policy. Judge Grenade stated, pointing to the Lankford case, that she believed that the handbook created a property interest. However, because the county administrator, Ms. Galbraith, had a written contract that she believed . . . That's what makes that case different from this case. There was a written contract in the other case. That's correct. And it was the interplay between the written contract and Ms. Galbraith did receive a But there was the interplay between the written contract and the personnel handbook. Other than the existence of the same employee's handbook, there's no factual overlap. Galbraith wasn't terminated or lost something because Lankford lost something. I gather. Your Honor, could you repeat that? Yeah. Was there any factual overlap between the two cases other than the existence of the employee handbook and a new probate judge coming in? And I was about to address that. In other words, the new probate judge didn't say, because of your collusion with Ms. Lankford, I'm going to fire you too, Ms. Galbraith. No, sir. Not at all. There was none of that. The county commission and Galbraith actually had a meeting and called Ms. Galbraith in to discuss disciplinary issues. There was some attempt at pre-termination. Other than the attorney representing both plaintiffs and the defendant, and the guide handbook, these are different cases. Yes, they are. Okay, okay. All right. I took a lot of your time. Do you need any more time? No, sir, I don't. And I was going to say this was my first opportunity to appear in front of the 11th Circuit and I appreciate that and I've enjoyed my time. Thank you. Well, I like your advocacy style because it's what it should be, which is a dialogue between the court and the attorney in answering questions. That's what's most helpful to us. Thank you. All right. Ms. Kidd, five minutes if you need it. I think that the questions that have been asked today and the very, you know, I mean, the Hale County personnel policies as they were written at the time clearly are terrible. I just called a spade a spade. You know, but Alabama case law and this court's case law applying Alabama law to similar issues has repeatedly focused on the fact that when there are, you know, differing provisions in a handbook, that's at least a genuine issue of material fact. And I think Judge Carnes, your question to Mr. Ingram was about the external manifestations. There are several Alabama cases, including Matthews versus Alabama A&M, which of course is another public employer case, where the court looked at it and said, okay, you know, you have an executive director. He says this is permanent. There was a question in there about whether that executive director actually had the authority to make that offer by himself, which I think is another issue here. But there are contradictory provisions. But in that case, the Alabama court looked at it and said, but the fact that in firing the plaintiff that the defendants had felt themselves bound by it and had acted in accordance with the provisions of the handbook tended to be evidence to show that they were in fact bound by that. You know, in this case, it's the exact opposite. Judge Crawford, and there's no dispute about that, Judge Crawford always believed that that at very least Ms. Langford didn't fall under those provisions. That, you know, the other issue, of course, they could have, and this would have been much simpler if they had just said, you know, employment's not at will. But while Hoffman and LaRoche does say that that's sufficient, there's no Alabama case law that says that that's necessary. I think that's a point of distinction. The other issue I wanted to briefly touch on is the issue of reinstatement. As Judge Abrams brought up, you know, where reinstatement could have come and should have come, and frankly, the courts with the jurisdiction to reinstate Ms. Langford were the state courts. That was her, that was how she could have gotten back, gotten back her job. The fact that she waived that, you know, at this point, it's just a pretermination. I'm not sure she waived her claim to reinstatement. In other words, I understood her theory to be, and the Jury Instruction Damages Award seems to have accepted it, her theory to be, if I had been given procedural due process protections up front, I would not have been fired because I could have convinced them not to fire me. And if that's true, and the verdict can be interpreted that way in my view, if that's true, then she is entitled some damages for having been terminated, not just mental and emotional distress, but the salary she lost and the retirement benefits that she lost. What's wrong with that theory? Your Honor, first of all, I'm sorry, I misspoke. She didn't, I'm not saying, she obviously hasn't waived reinstatement in the sense of before this Court. She waived her right to her hearing to go on before the Alabama State Courts. In terms of the damages and the theory about, you know, that if she'd been given the procedural due process, in this particular case, there's never been any evidence that that was the basis, that that was a fact. As a matter of fact, both sides actually agreed, although for totally different reasons, that there was nothing that Ann Langford could have said or done to change Judge Crawford's mind. Then why did you agree with the jury instructions, which didn't really charge the jury, that if there was nothing she said, could have said or done to prevent that, then there's no damages? Your Honor, that goes back to- Other than nominal damages. Yes. That goes back to the fact that at the time, there were substantive claims. There was a substantive race claim and there was also a First Amendment association claim. I'm not talking about the jury instructions on those. I'm talking about the jury instructions on procedural due process, pre-termination hearing violation. Yes, Your Honor. You should have been charging hard and say, look, you need to charge this jury that if there is no evidence, if there's no basis, unless they find that she would not have been terminated, then the most damages they can give her is a dollar. You should have moved for 50A and 50B judgment on that basis. In that particular instance, Your Honor, I see my time has elapsed. Okay, thank you. In that particular instance, we recognize that if the jury had found that she was terminated for an improper reason, then it necessarily would have been, also would have played into the idea that she wouldn't have gotten fair procedural due process because of the issue of bias. There was a jury instruction in there that said that, you know, if you find for, you have to find everything, the damages will be the same because if, you know, damages are the same for termination across the substantive and the due process claim. And I note that there's never been, neither the district court nor, frankly, Ms. Langford has ever put forth a claim, an actual argument that that was the basis. While that certainly hypothetically could have been. If it was your theory that the procedural due process violation from denial of a pre-termination hearing alone could not result in any damages beyond $1 unless they showed that she wouldn't have been fired if she had been given a hearing, then you should have asked for an instruction to that effect, rather than saying, well, if we lose on the other claims, it won't make any difference. Well, Your Honor, I think it was clarified to the jury in the instructions they were told that you either only had to do nominal damages or damages based on her termination if you find that she would not have been terminated. In the unique facts of this case, though, given that the substantive claims are out, neither the district court nor . . . As for 50A judgment as a matter of law, before the case was submitted to the jury on the theory that there was no evidence that if she had been given a pre-termination hearing, she wouldn't have been fired? Yes, Your Honor. And that is actually, to be candid, an issue of some dispute here. We asked for all claims and all counts and . . . But that general request doesn't do it. You have to tell the court exactly what the defect in the evidence presented is. I understood that by the time you raised it and you trial remitted to her or whatever, you had not raised it specifically at 50A stage, the close of their evidence. Am I wrong? No, Your Honor. We did not specifically discuss the nominal damages issue in that. You brought this down on yourself. Okay. Before you all leave, and I've got the permission of my colleagues to do this, although not necessarily the content of what I'm saying, just the fact I'm saying it. This case cries out for a negotiated settlement. I mean, it really does. I gather based on past history with similar cases that there's some bad blood on both sides. In the best interest of each side's client, you all can negotiate first with your clients around the bad blood and say, look, this case could go either way. You should have heard oral argument. We were confused. The court was a little bit confused and you can lose everything. You can lose everything. But this lady wants an income, a salary. She's willing to work for it. She wants access to the retirement thing given her stage in life. That's the kind of stuff you can negotiate. I doubt if her counsel realistically expects that a court's going to order her back into that. I can't believe she'd want that. She's volunteering for other work positions as I understand it. We'll decide this case. I'm not saying this because it's any burden to decide. It's unclear. I don't know how we would decide if we hadn't conferred about it or anything. You've heard as much of the views of my colleagues as I have. But I'm telling you, this all or nothing one way or the other kind of thing is the kind of thing that really ought to be set down and negotiated out. We won't know what happens in mediation. So you can walk into mediation the first day and say, my client doesn't want any part of it. I'm here because the court ordered me or telephoned however they do it, however they do it in your case. And we won't know. So we're not taking away from you the right to a decision. We'll give you the decision. You very well may not like it, but we will give you the best decision we can give you on the thing. I'll get out of standard order referring y'all to mediation in our mediation office. I don't think this case is linked to Galbraith, but I'll make sure there's no ruling on the employee handbook, property rights issue in Galbraith until y'all decide whether you're going to settle this case or not because I don't want that to affect this kind of thing. Any questions about that? The mediator's office will get in touch with you pursuant to our order and that same. But we really would appreciate on behalf of your clients and general peace. You know, there's that scriptural verse about blessed are the peacemakers. Y'all try to make some peace on the thing. Okay? There you go. All right. Next case up is certain underwriters at London versus FDIC. Okay.